**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LINDA R. STONE                            )<br>                                                        )<br>                                                        )<br>   **Plaintiff,**                                 )<br>                                                        )<br>v.                                                      )<br>                                                        )<br>JOANNE B. BARNHART, Commissioner of the )<br>Social Security Administration,       )<br>                                                        )<br>   **Defendant.**                             ) | Case No. 05-CV-155-PJC |

## ORDER

Claimant, Linda R. Stone ("Stone"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Stone's application for disability benefits under the Social Security Act. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Stone appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that claimant was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

**Claimant's Background**

Stone was born on July 5, 1948, and was 55 years old at the time of the ALJ's decision. (R. 55B, 282). She has GED education and graduated from Tulsa Business School. (R. 283, 63). Stone worked in advertising sales with Yellow Pages and as a sales associate in real estate. (R. 58). Stone alleges an inability to work beginning April, 1999 due to migraine headaches. (R. 57,

284).  She also claims to suffer from hypertension due to her migraines. (R. 59, 112, 114-120, 252, 255-57).

Stone has been under treatment for her migraine headaches by Gary Goforth, D.O., for approximately 10 years. (R. 129). And the medical records reflect continuous monthly or bimonthly treatment from April 10, 1998 through April 6, 2004. (R. 111-20, 251-57).  Dr. Goforth reported that Stone has had problems with migraine headaches since childhood and the frequency, duration and level of pain has intensified as she has gotten older. (R. 129). He has prescribed Fiorinal with codeine for headache pain and Phenergan for nausea.  (R. 111-20, 129, 251-57). He stated that Stone continues to use Fiorinal with codeine four to six times a day. *Id*. In addition, Dr. Goforth opined that due to fatigue, opioid analgesics and migraine pain, Stone would be "unable to complete an eight-hour day on a consistent basis or to perform at a steady, uninterrupted pace." (R. 129).  He further noted that her analgesics would "potentially impair judgment, thinking, motor skills, concentration, memory and learning capabilities." *Id.*

In August 2003, Stone was found unconscious at her home lying in urine and feces. (R. 129, 154, 160, 169, 173).  She was admitted to the Coronary Care Unit at Saint Francis Hospital with multiple medical issues including a possible overdose of Tussionex, which she had been taking for a respiratory tract infection. (R.160-61, 169, 171).  During her hospitalization from August 3 through August 29, 2003, she was determined to have suffered from acute myocardial infarction and probable sepsis and placed on mechanical ventilation due to respiratory failure complicated by pneumonia from pulmonary aspiration from vomiting. (R. 129, 169-71, 189-91). She was also diagnosed with right jugular venous thrombosis, gastrointestinal bleed, possible seizure disorder (though no seizure activity occurred during hospitalization) and depression. (R.

190).  She underwent diagnostic testing which included chest x-rays and CT scan, an electrocardiogram ("EKG"), an echocardiogram, a lumbar puncture, a routine head CT scan, an electroencephalogram ("EEG"), and an esophagogastroduodenoscopy. (R. 148-88).

After her discharge, Stone went to Brian Worley, M.D., for follow-up care. (135-42). On Dr. Worley's recommendation, Stone underwent a CT scan of the chest on September 22, 2003 to evaluate a mass in the right upper lobe of her lung. (R.136, 141-42, 264-65). The CT scan indicated that the mass probably represented evolving infarct rather than a neoplastic mass; continued follow-up was recommended. (R. 141, 264). Dr. Worley noted "areas of scar and increased interstitial markings," but determinated that a biopsy was not necessary. (R. 135).  On September 22, 2003, Dr. Worley noted "continued resolution of her CT findings" and continued Stone on Coumadin to resolve the right internal jugular deep venous thrombosis. *Id.* A follow-up CT chest scan on December 5, 2003 showed further resolution of the infiltrates in her lungs. (R. 261, 276). After a right internal jugular ultrasound on February 5, 2004 showed no evidence of thrombosis, Dr. Worley discontinued treatment with Coumadin and started Stone on Neurontin for chest wall pain from her right pleural friction rub.  (R. 259, 271-75).  Her lungs were otherwise clear, with no wheezing. (R. 271).

Stone's records show that she has also been treated by Max Deardorff, M.D. for gynecology care, including pap smears, orders for routine mammogram screening and pelvic sonograms performed by Saint Francis Hospital, bone density screening, laboratory tests, and hormone therapy. (R. 87-110, 230-37, 266-70).

Further, Stone was admitted by Jian Xing, M.D., as an outpatient to Saint Francis Hospital for right upper quad abdominal pain on September 16, 2003. (R. 143).  Testing showed

3

multiple calculi within the lumen of the gallbladder; however, there was no evidence of thickening of the gallbladder wall. (R. 144).

In addition, the medical records reflect that Stone has had four colonoscopies performed by Marc Rocklin, M.D., initially due to complaints of intermittent diarrhea and abdominal pain. (R. 228-29, 239-40, 246, 248-49). On December 3, 1993, she had three colon polyps removed during a colonoscopy. (R. 248-49). The colonoscopies performed on December 16, 1994, February 22, 2001 and April 24, 2003 were normal. (R. 228-29, 239-40, 246).

A Residual Physical Functional Capacity Assessment was completed by a DDS physician on April 29, 2003.  (R. 121-27). The DDS physician assessed that Stone could lift and carry 25 pounds frequently and 50 pounds occasionally; stand and/or walk and sit for about 6 hours out of an 8-hour day; and push/pull without limitation. (R. 122). The doctor found no postural, manipulative, visual, communicative, or environmental limitations.  (R. 123-25). Regarding Stone's migraine headaches, the DDS physician noted the following:

> Clmts ADLs appear slightly impaired when having a migraine but states she doesn't have a routine migraine dictate.  She has been to emergency room for a shot for the headaches, but has not been to the hospital since 1999–now she goes to the doctor and he can give her a shot or medication.  Clmt is limited at the time of headache but not otherwise–she does experience high blood pressure.  Claimant cleans her house, does laundry and ironing, and household maintenance–she does not have help.  She shops weekly and does not need help shopping. It is felt this RFC supports the claimant's impairment.

(R. 122).

## Procedural History

On December 9, 2002, Stone protectively filed for disability benefits under Title II, 42 U.S.C. § 401 *et seq.*, and for Supplemental Security Income benefits under Title XVI, 42 U.S.C.

§ 1381 *et seq*. (R. 55-77).  Stone's  application for benefits was denied in its entirety initially and on reconsideration. (R. 42-43).  A hearing before ALJ Gene M. Kelly was held December 2, 2003, in Tulsa, Oklahoma. (R. 277-316).  By decision dated January 27, 2004  the ALJ found that claimant was not disabled at any time through the date of the decision. (R. 26-36).  On January 14, 2005, the Appeals Council denied review of the ALJ's findings. (R. 5-8).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."

42 U.S.C.§423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920. [1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to support a conclusion." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (citation omitted). In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Id.* (citation omitted). Nevertheless, the court examines "the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis, determines if the substantiality of the evidence test has been met." *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991).

---

[1] Step One requires the claimant to establish that she is not engaged in substantial gainful activity, as defined by 20 C.F.R. §§ 404.1510, 416.972. Step Two requires that the claimant establish that she has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520©, 416.920©. If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that she does not retain the residual functional capacity ("RFC") to perform her past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520, 416.920.

**Decision of the Administrative Law Judge**

The ALJ made his decision at the fifth step of the sequential evaluation process. He found that Stone had "severe" problems with headaches, shortness of breath, hypertension, stomach, gallbladder, heart, seizure, depression, hands, fingers and deep vein thrombosis, but that she did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 31). The ALJ found that Stone had the residual functional capacity ("RFC") to perform a restricted range of light work. *Id.* The ALJ determined that Stone could not perform her past relevant work in advertising sales or real estate sales, but there were other jobs existing in significant numbers in the national and regional economies that she could perform, based on her RFC, age, education, and work experience, specifically order clerk and mail clerk. (R. 32). The ALJ concluded that she was not disabled under the Social Security Act at any time through the date of the decision. *Id.*

**Review**

Stone alleges that the ALJ (1) applied the wrong legal standard for assessing the opinion of her treating physician, Dr. Goforth, (2) did not properly assess Stone's credibility, and (3) inappropriately demanded "objective" medical evidence of headache pain. These errors center around the ALJ's rejection of Dr. Goforth's opinion and Stone's testimony as to the severity, duration and frequency of her migraine headaches.

**A.     Treating Physician's Opinion**

In his decision, the ALJ acknowledged Dr. Goforth's November 18, 2003 letter in which Dr. Goforth opined as follows:

> Linda has been my patient for over ten years. She has had problems with
> migraine headaches since childhood. The older she gets the frequency, duration

> and level of pain intensifies. They became chronic around nineteen ninety-eight and have proceeded to become quite debilitating. She has them on a constant daily basis, frequently with nausea and vomiting. Linda also has high blood pressure and depression. In August, she was found unconscious and was hospitalized on mechanical ventilation due to respiratory failure, complicated by pneumonia due to pulmonary aspiration from vomiting, acute myocardial infarction and probable sepsis. She also had a right internal jugular thrombosis. The last thing Linda remembers is the most violent migraine headache she has ever had. She continues to be weak from her illness but is recovering. She continues to complain of daily migraine headaches with nausea, vomiting and photophobia. She continues to use Fiorinal with codeine four to six times on a daily basis for pain and Phenergan for nausea.
>   In my medical opinion, Linda is unable to work an eight-hour day, five days a week. Due to her fatigue, opioid analgesics and migraine pain, she would be unable to complete an eight-hour day on a consistent basis or to perform at a steady, uninterrupted pace on a daily basis. She could be expected to be absent fifty percent of the time. Her analgesics would potentially impair judgment, thinking, motor shills, concentration, memory, and learning capabilities.

(R. 129). The ALJ, however, rejected Dr. Goforth's opinion as one on the ultimate issue of disability and unsupported by diagnostic testing, laboratory reports or clinical findings. (R. 29) The ALJ found the medical evidence of Stone's migraine headaches "rather vague," consisting primarily of "prescription refills, with little or no testing being performed." *Id*. Noting that the August 4, 2003 CT scan of Stone's brain indicated no significant radiographic abnormality, and the August 5, 2003 EEG showed "no evidence of focal slowing, nor seizure activity," the ALJ concluded there were no "objective medical findings to support the claimant's complaints of disabling pain" from her migraines. *Id*. He thus afforded "little probative weight" to Dr. Goforth's opinion.

A treating physician may offer an opinion that reflects a judgment about the nature and severity of the claimant's impairments, including the claimant's symptoms, diagnosis and prognosis, what the claimant can do despite his or her impairment, and any physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). A treating physician's opinion must be

8

given substantial weight unless good cause is shown to disregard it. *Goatcher v. U. S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). In addition, without supporting evidence to the contrary, the ALJ cannot interpose his own "medical expertise" for that of a physician, especially when that physician is the regular treating doctor." *Kemp v. Bowen,* 816 F.2d 1469, 1476 (10th Cir. 1987).

First, the Court notes that although controlling weight cannot be given to medical opinions on issues reserved to the Commissioner, Social Security Ruling 96-5p states that the ALJ "must always carefully consider medical source opinions about any issue, including opinions about issues reserved to the Commissioner" and that for treating source opinions, the ALJ "must make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us." Social Security Ruling ("SSR") 96-5p.  The Ruling further states:

> opinions from any medical source on issues reserved to the Commissioner must never be ignored.  The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner.  If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.

SSR 96-5p.  Thus, Dr. Goforth's opinion cannot be disregarded simply because he opines that Stone is unable to work.

Further, contrary to the ALJ's finding, the medical record of Stone's migraine headaches is not "vague."  Dr. Goforth stated that he has treated Stone for over ten years, and the record contains six years of medical records documenting monthly and bimonthly treatment of Stone's migraine headaches. (R.129,112-120, 251-57).  These records substantiate Dr. Goforth's

statement in his November 18, 2003 letter that "Stone continues to use Fiorinal with codeine four to six times a day for pain and Phenergan for nausea." *Id*. In addition, Stone testified that when her migraine headaches last as long as five to ten days she has to go to Dr. Goforth for a shot as the medication does not relieve the headaches. (R. 293-94). Dr. Goforth's records corroborate that Stone sought and received Kenalog injections[2] on multiple occasions through mid-2003 (R. 115-17, 120, 255), and although Dr. Goforth refused to administer the shot when Stone was taking Coumadin after her hospitalization, she requested Kenalog injections on several occasions from mid-2003 through March 2004 (R. 252, 256-57). Stone also stated that when she has a migraine headache, her blood pressure "gets so dangerously high," that if it continues more than five days she must see her doctor because of risk of a stroke. (R. 291, 306). Again, Dr. Goforth's medical records substantiate Stone's hypertension on many instances during her frequent visits for treatment of her migraine headaches. (R. 112, 114-120, 255-57). Finally, in his letter, Dr. Goforth notes that Stone was found unconscious and hospitalized from August 3, 2003 to August 29, 2003, "on a mechanical ventilation due to respiratory failure, complicated by pneumonia due to pulmonary aspiration from vomiting, acute myocardial infarction and probable sepsis" following the most "violent migraine headache she has ever had." (R. 129).

In short, there is ample medical evidence supporting Dr. Goforth's opinion regarding the debilitating effects of Stone's migraine headaches. *See Pennington v. Chater*, 1997 WL 297684 at *2 (10th Cir.)(finding that claimant's physician's notes reflecting that claimant consistently sought relief from migraine headaches and received narcotic medication for that purpose

---

[2] Kenalog is a corticosteroid used in treatment of migraine headaches due to its anti-inflammatory effects. *See e.g.* Serapin, *available at* http://serapin.com/migraine.html (Last visited June 26, 2006).

10

supported a finding of disability); *Volak v. Chater*, 1995 WL 490295 at *2 (10th Cir.)(finding that ALJ improperly rejected the opinions of two treating physicians that claimant was disabled due to migraine headaches or the headaches in combination with other impairments as the "record is replete with reports of claimant's visits to numerous doctors for treatment of his ailments, including the headaches").

It appears that the ALJ may have rejected Dr. Goforth's opinion due to the "lack of conclusive laboratory-type findings to confirm claimant's diagnosis and/or symptomatology." *Pennington*, 1997 WL 297684 at *3. In rejecting Dr. Goforth's opinion, the ALJ notes that Stone's August 4, 2003 "CT scan of the brain indicated no significant radiographic abnormality" and, though abnormal, her August 5, 2003 EEG indicated "no evidence of focal slowing, nor seizure activity." (R. 29). To the extent the ALJ may have found that these test results exclude disabling migraine headaches, that conclusion is unsupported. The hospital records do not indicate that Stone underwent the brain scan or EEG to determine the etiology of her migraine headaches or that such tests would confirm or refute the existence or severity of her migraine headaches. There is no evidence in the record that these tests or any other medical procedure can or did rule out or evaluate the claimed severity of Stone's migraine headaches. If such a medical procedure is available, the ALJ did not identify it. *See Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 743-44 (10th Cir. 1993) (ALJ erred in discrediting treating physician's unchallenged diagnosis of chronic fatigue syndrome because of lack of "dipstick" laboratory test when none exists.); *Pennington*, 1997 WL 297684 at *3 ("[W]e are aware of no medical procedures to objectively evaluate either the severity of a migraine or pain; and where

11

no such conclusive tests exist, the failure to produce such test results is surely an improper basis for discrediting a claimant's uncontroverted testimony.").

Finally, the ALJ erred in failing to address Dr. Goforth's opinion that Stone's analgesics might "impair judgment, thinking, motor skills, concentration, memory, and learning capabilities," with regard to her ability to work. (R. 129). Dr. Goforth stated, and his medical records reflect, that Stone takes "Fiorinal with codeine four to six times on a daily basis for pain and Phenergan for nausea." *Id.* Fiorinal with codeine is a strong narcotic pain reliever and muscle relaxant and phenergan may cause considerable drowsiness. *See* Physicians' Desk Reference, *available at* http://www.pdrhealth.com/drug_info/rxdrugprofiles/drugs/fio1177.shtml (last visited June 22, 2006). Phenergan is useful for the prevention and control of nausea and vomiting and may cause marked drowsiness or impair mental and/or physical abilities. PHYSICIANS' DESK REFERENCE, 3362 (Lori Murray ed., 59th ed. 2005). Although Dr. Goforth expressly opined that Stone would be unable to "complete an eight-hour day on a consistent basis or to perform at a steady, uninterrupted pace on a daily basis" and could be "absent fifty percent of the time," due to her fatigue, *opioid analgesics* and migraine pain (R.129), there is no discussion in the decision regarding the effects of her medication on her ability to work. This is error. "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). On remand, the ALJ should evaluate the nature and effect of Stone's medications in weighing Dr. Goforth's opinion and in assessing her ability to work. *Moore v. Barnhart*, 114 Fed.Appx. 983, 995 (10th Cir. 2004) (In assessing the debilitating effects of claimant's migraine headaches and

fibromyalgia, the ALJ must "further evaluate the evidence of the claimant's repeated attempts to seek medical relief for her pain, the numerous medications she has taken and her various attempts to alleviate the pain."); *see also Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004).

In sum, the ALJ did not show good cause for rejecting Dr. Goforth's opinion. Accordingly, the Court concludes that the ALJ erred in failing to apply the correct legal standard in assessing the opinion of Stone's treating physician.

**B.      Credibility Determination**

Stone also asserts that the ALJ did not apply the correct legal standard for assessing her credibility because the ALJ's decision states only the legal conclusion that he does not believe the headaches are as severe as Stone claims. In addition, Stone claims that the "diagnosis of a migraine headache is a clinical diagnosis that like fibromyalgia or mental illness does not have a 'dipstick' laboratory test to rely on for confirmation." *Plaintiff's Opening Brief, p. 6*. Since there is no indication by any physician that Stone is faking or malingering, Stone argues that the ALJ's finding as to her credibility is not supported by substantial evidence.

Conversely, the Commissioner responds that the ALJ thoroughly evaluated and discussed Stone's impairments.  Specifically, the ALJ considered that despite her complaints of disabling headaches, Stone performs daily chores, takes care of her personal needs, shops, watches television, drives, reads, and takes care of rental property.  In addition, the Commissioner notes that the majority of medical records were prescription refills with little objective evidence to support the extent of her complaints. After the initial diagnosis, Dr. Goforth did not perform a thorough examination of Stone nor conduct a meaningful review of her symptomology.

Therefore, the Commissioner asserts that the Claimant has failed to establish that her impairment results from anatomical, physiological or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. §§ 404.1508, 416.908

When determining credibility, the ALJ is to state "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7. The Tenth Circuit has set forth a framework for analyzing the evidence of allegedly disabling pain. *Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995). The ALJ "must consider (1) whether Claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the Claimant's subjective allegations of pain; and (3) if so, whether considering all the evidence, both objective and subjective, Claimant's pain is in fact disabling." *Id.* (quotation omitted). A conclusory paragraph is not sufficient to discredit a claimant's claim of pain. The ALJ must make specific findings of fact, so that the reviewing court does not have to speculate as to the reasons for the ALJ's decisions as to a claimant's credibility. *Id.* at 391.

First, as the Court noted above, to the extent the ALJ may have determined that Stone failed to establish a pain-producing impairment because there is a "lack of conclusive laboratory-type findings to confirm claimant's diagnosis and/or symptomatology," the Court finds no support for this conclusion. *Pennington*, 1997 WL 297684 at *3. Further, the ALJ incorrectly discounted Stone's credibility because "the claimant's treating physicians did not place any functional restrictions on her activities that would preclude light work activity" within certain limited restrictions. (R. 30). To the contrary, Dr. Goforth opined that her "analgesics would

14

potentially impair judgment, thinking, motor skills, concentration, memory and learning capabilities," and together with her fatigue and migraine pain, would preclude her from performing "at a steady, uninterrupted pace on a daily basis." (R. 129).

Finally, the ALJ discredited Stone's credibility based on her testimony that she is able to shop, watch television, read, keep up with rental property, mow, do home repairs and paint. (R. 297-99, 304-05, 308). However, this mischaracterizes Stone's testimony. Stone testified that she only shops for cleaning supplies and sundries and does not go grocery shopping; she spends thirty minutes on a riding lawn mower once a week; she is no longer able to "do any pleasure reading the way [she] used to"; the only home repairs she tried to do was to paint her house but had only completed two sides in a year or a year and a half; her up-keep on her rental duplex was limited to only light cleaning when renters move out (renters on one side had been there for almost four years and those on the other had been there for a year), and she hires out the carpet cleaning and painting on the duplex. (R. 297-98, 304-05). Stone further explained that when she is suffering from a migraine headache, she is unable to do anything but lie down in a dark, quiet room. (R. 305-07). Stone testified that there is no set pattern or degree of intensity to the headaches, but they typically last three to five days. (R. 306-08). When she has a migraine headache, she cannot eat or shower. (R. 307). Stone's testimony regarding her daily activities is therefore not necessarily inconsistent with disabling pain as she testified that she did not engage in these activities when she had a headache. *Pennington*, 1997 WL 297684 at *4 (finding that claimant's testimony that he lived alone, took care of his own personal and household needs, drove, did yard work and vacuumed on "good days" was consistent with his claim that his migraine headaches were disabling); *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.

1993) (noting the sporadic performance of household tasks does not establish that a person is capable of engaging in substantial gainful employment); *Berryhill v. Barnhart*, 64 Fed.Appx.196, 200 (10th Cir. 2003) (claimant's ability to watch television, listen to music, visit relatives, wash dishes and clothes, shop and drive is insufficient to establish that she can work on a consistent basis). On remand, the ALJ should consider the above in determining Stone's credibility.

## Conclusion

Reviewing the record in light of these authorities, the Court concludes that the ALJ failed to adequately consider the opinion of Dr. Goforth and improperly determined Stone's credibility. Therefore, the Court **REVERSES AND REMANDS** the case for further proceedings consistent with this opinion.

DATED this 27th day of June, 2006.

*[signature]*

Paul J. Cleary
United States Magistrate Judge